

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00027-CV

IN THE INTEREST OF A.R., THE
CHILD

----------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2012-61009-393

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellants N.K. (Mother) and J.R. (Father) appeal the trial court's order terminating their parental rights to their daughter, A.R. We will affirm.

### II. BACKGROUND

Mother and Father were both twenty years old when A.R. was born in May 2012. A social worker at the hospital met with the couple to address several

----

[1]*See* Tex. R. App. P. 47.4.

concerns that were raised regarding their ability to care for A.R. Although the hospital released A.R. into Mother's and Father's care, a report was made to CPS detailing concerns about A.R.'s safety and care, including that Mother and Father needed multiple explanations about how to perform basic tasks for A.R. (like properly preparing a bottle), that there was domestic violence occurring in the household (there were holes in the wall of the apartment), and that the family home was not yet ready for A.R. CPS consequently initiated an investigation and recommended that Mother and Father participate in family-based safety services, such as counseling and parenting classes. During that period of time, Mother and Father were "very defensive" about CPS's involvement in their lives, were openly hostile to investigators at times, and failed to complete the services. Concerned about Mother's and Father's ability to ensure A.R.'s safety, in early August 2012, when A.R. was about two months old, Appellee Texas Department of Family and Protective Services (TDFPS) filed its petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship and removed A.R. from the parents' care.[2] During the removal, a struggle ensued when Father refused to turn over A.R., and Father struck a CPS investigator. Police arrested Father and charged him with injury to a child and

---

[2]CPS found reason to believe neglectful supervision by both Mother and Father and reason to believe physical abuse by Father based on an incident that occurred during A.R.'s removal.

2

assaulting a public servant; he remained incarcerated throughout the pendency of the case.

Between A.R.'s removal and the termination trial in January 2014, Mother completed only part of her service plan, and one caseworker opined that Mother did not learn or benefit from the services that she did perform. Indeed, among other things, Mother refused to cooperate with one provider, she prohibited another provider from performing his job because she failed to complete an evaluation, and her hyper-religiousness, or preoccupation with religion, caused a number of providers serious concern about her ability to care for A.R. Mother testified at the termination trial that all of the service providers were conspiring with CPS to ensure that her parental rights were terminated, and she contended that no service was offered for a legitimate purpose.

A jury found by clear and convincing evidence (1) that Mother and Father had knowingly placed or knowingly allowed A.R. to remain in conditions or surroundings that endangered her physical or emotional well-being; (2) that Mother and Father had engaged in conduct, or knowingly placed A.R. with persons who had engaged in conduct, that endangered her physical or emotional well-being; (3) that Mother and Father had failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of A.R.; and (4) that termination of Mother's and Father's parental rights to A.R. was in the child's best interests. *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (E), (O), (2) (West 2014). Mother and Father appeal.

3

## III. FATHER'S APPEAL

### A. Evidentiary Sufficiency

Father argues in his first and second issues that the evidence is legally and factually insufficient to support the jury's subsection 161.001(1)(D) and (E) endangerment findings.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2014); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so, and disregard all evidence that a reasonable factfinder could have disbelieved. *Id.*

In reviewing the evidence for factual sufficiency, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1). Tex. Fam. Code Ann. § 161.001;

4

*In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

Endangerment means to expose to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection 161.001(1)(D). *Id.* Conduct of a parent in the home can create an

5

environment that endangers the physical and emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125.

The trial court may also order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *Id.*; *In re D.M.*, 58 S.W.3d 801, 812–13 (Tex. App.—Fort Worth 2001, no pet.). A factfinder may also infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re*

6

*M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). In conducting an evidentiary sufficiency review of a factfinder's subsections 161.001(1)(D) and (E) findings, this court has previously considered, among other things, evidence that a child was exposed to domestic violence. *See In re M.R.*, 243 S.W.3d 807, 818 (Tex. App.—Fort Worth 2007, no pet.).

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126.

The record contains evidence from which the jury could have concluded that Father has committed, and is inclined to further commit, domestic violence.[3] Mother and Father have a history of engaging in heated arguments laced with profanity. On one occasion in April 2012, Mother, who was pregnant, called 911 after an argument with Father because she thought that she had gone into labor. On another occasion, in a recorded conversation, Father threatened to sodomize Mother and to kill himself. Mother downplayed the severity of the incidents or altogether denied that domestic violence was occurring in the household, and one provider expressed concern about Mother's outright refusal to answer

---

[3]One of Mother's provider's defined domestic violence as "the continued and purposeful demeaning and abuse of a partner or a family member through physical, emotional, sexual and financial means."

questions about potential domestic violence. Once Father became aggressive and yelled obscenities at a CPS investigator.

The jury also heard evidence relating to physical violence. CPS had questions and concerns about multiple holes in the sheetrock of Mother and Father's apartment. Mother claimed that the holes were caused by Father's roughhousing with friends, but a caseworker believed that Mother and Father were untruthful about their origin. In another incident, Father endangered A.R. during an altercation with CPS investigators and police when CPS attempted to remove A.R. from Mother's and Father's care. Holding A.R., Father became irate when officers prohibited him from leaving the residence. A.R. began crying and turning "red, almost purple," and when a caseworker attempted to retrieve A.R. from Father—thinking that A.R. was in "extreme distress" in Father's arm—he grabbed one of A.R.'s legs and struck the caseworker's face. A.R. went to the hospital afterwards and had a cast placed on one of her legs. A caseworker opined that the chances of domestic violence occurring in the future between Mother and Father were "very great."

Additional endangering conduct by Father included his inability to understand how to properly care for A.R. Father was A.R.'s primary caregiver after Mother returned to work (Father was unemployed), and Mother testified that she intended to stay with Father after his release from jail. The initial report to CPS regarding A.R. included concerns about Father's need to have certain caregiving activities explained to him multiple times. Indeed, during the

investigation stage, Father confirmed that he was "slow," that he did not know how to read, and that he needed things explained to him several times. When an investigator attempted to discuss basic newborn care with Father—e.g., how many ounces of water and formula go into a bottle and how many feedings should be performed in a day—Mother interrupted and attempted to answer for him. When the investigator redirected the question to Father, he said that he did not know and that he needed multiple explanations. The investigator demonstrated how to prepare a bottle for A.R., and even made a chart for Father to use, but he did not grasp the process. Along those lines, a nurse practitioner from PediPlace testified that Mother and Father had expressed concern to her about A.R. vomiting—which is caused by overfeeding—even after they had previously been counseled about overfeeding A.R.

A psychologist who examined Father described him as "quite immature"; explained that Father's responses were akin to something that he would expect from a seven-, eight-, or nine-year-old child; and opined that Father had "some rather grandiose or unrealistic and narcissistic beliefs about himself." According to the psychologist, narcissistic individuals believe that they possess abilities that other people do not have, and an example of this in Father's case was his belief for a brief period of time that A.R., a newborn baby, could communicate with him by squeezing his finger—once meaning that she needed a diaper change and twice meaning that she needed a feeding. According to the psychologist, Father's narcissism "will negatively impact his ability to appreciate how his

9

choices affect [A.R.'s] well-being," and his immaturity could pose a danger to a small child in his care. Likewise, a nurse practitioner testified that she had concerns about A.R.'s basic care, and one of Father's caseworkers testified that she did not believe that Father had the ability to properly care for a young child.

Father additionally endangered A.R. through his ongoing association and relationship with Mother. A number of providers expressed concern about Mother's refusal to communicate with them during counseling and her repeated references to and invocation of religion, which effectively hampered or prohibited the sessions from progressing. One provider provisionally diagnosed Mother as having features of a schizotypal personality and explained that "the extremity and pervasiveness of her spiritual beliefs can be viewed as pathological and interfere with important aspects of her functioning." In other words, Mother uses her "religiosity . . . [as] a defense against [the things that are complex, stressful, or threatening to her] by saying, hey, nobody can say anything, that I'm doing anything wrong because it's based on my religion. So that way, I can't be criticized, I can't be given feedback, I can't be challenged." According to the provider, Mother's preoccupation with religion interfered with her daily life and can put a child at risk.

Similarly, a psychiatrist who examined Mother was unable to make a formal diagnosis because Mother refused to answer numerous questions, but he did express concern about mother's "hyper-religious attitude, as well as her inability to be open with" him. The psychiatrist opined that Mother's behavior

could be indicative of schizotypal personality disorder, in which "one does not have intact reality testing." As that pertains to Mother's ability to parent, the psychiatrist expressed concern that Mother was "unable to assess situations with [her] child and properly care for [her]."[4] There was no indication in the record that Father did not intend to be in a relationship with Mother in the future.

We hold that the evidence is legally and factually sufficient to support the jury's family code subsection 161.001(1)(D) and (E) endangerment findings. We overrule Father's first and second issues. Because only one ground under section 161.001(1) is needed to support termination, we do no reach Father's third issue challenging the sufficiency of the evidence to support the jury's subsection (O) finding. *See In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Directed Verdict

In his fourth issue, Father argues that the trial court erred by denying his motion for a directed verdict because one of the requirements of family code section 161.003 (that the illness or deficiency will continue to render the parent unable to provide for the child's needs until her eighteenth birthday) is implicitly required by subsections 161.001(1)(D) and (E), and TDFPS failed to meet its burden of proof as to the implied requirement. Father's directed-verdict motion did not include this specific ground for relief. Because his argument on appeal

---

[4]When asked what she would do if A.R. was sick, Mother responded that she would "pray over" A.R. and "pour the blood of Jesus over" her to help heal her. After some prompting, Mother said that she would then take A.R. to the doctor.

11

does not comport with his motion at trial, he failed to preserve this issue for appellate review.[5]  *See* Tex. R. App. P. 33.1(a)(1).  We overrule Father's fourth issue.

## IV. MOTHER'S APPEAL

Mother's court-appointed appellate counsel has filed a motion to withdraw as counsel and a brief in support of that motion.[6]  Counsel's brief and motion meet the requirements of *Anders v. California* by presenting a professional evaluation of the record demonstrating why there are no reversible grounds on appeal and referencing any grounds that might arguably support the appeal.  *See* 386 U.S. 738, 741, 87 S. Ct. 1396, 1400 (1967).  This court previously has held that *Anders* procedures apply in parental termination cases.  *See In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.).

In our duties as a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous.  *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays v. State*, 904 S.W.2d 920, 922–23 (Tex. App.—Fort

---

[5]We also note that Father asserted only factual sufficiency grounds in his motion for a directed verdict.  While a trial court may grant a *motion for judgment* on legal or factual sufficiency grounds, *see Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303 (Tex. 1988), a *motion for directed verdict* challenges the existence of legally sufficient evidence to support a ground.  *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

[6]Mother filed what we construed to be a response.

Worth 1995, no pet.). Only then may we grant counsel's motion to withdraw. *See Penson v. Ohio*, 488 U.S. 75, 82–83, 109 S. Ct. 346, 351 (1988).

We have carefully reviewed the appellate record, counsel's brief, and Mother's response. We agree that Mother's appeal is wholly frivolous and without merit. We find nothing in the record that might arguably support the appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005). Accordingly, we grant Mother's appellate counsel's motion to withdraw.

## V. CONCLUSION

Having overruled Father's dispositive issues, we affirm the trial court's order terminating the parent-child relationship between Father and A.R. Having determined that Mother's appeal is wholly frivolous and without merit, and having granted Mother's appellate counsel's motion to withdraw, we affirm the trial court's order terminating the parent-child relationship between Mother and A.R.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED: July 17, 2014

13